# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN  DIVISION

| | | |
|---|---|---|
| **MAJOR STEPHENS,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | |
| | ] | **CASE NO. 2:16-CV-274-KOB** |
| **CITY OF TARRANT, et. al.,** | ] | |
| | ] | |
| **Defendants.** | ] | |
| | ] | |
| | ] | |

## MEMORANDUM OPINION

This § 1983 matter asserts federal claims against the City of Tarrant and various officials with its police department for excessive use of force; failure to train, supervise, discipline and investigate use of force; and various state law claims.  It comes before the court on the Defendants' "Motion to Dismiss Plaintiff's Amended Complaint." (Doc. 36).   The Plaintiff filed a response (doc. 38), and the Defendants filed a reply (doc. 42).

For the reasons stated in this Memorandum Opinion, the court WILL GRANT IN PART and DENY IN PART this motion to dismiss.  More specifically, the court FINDS that all claims in Counts I and IV are due to be GRANTED; and all claims in Counts II, III and V are due to be DENIED.

## I.  PROCEDURAL HISTORY

This is the second round of briefing attacking the sufficiency of the pleadings.  The City filed the first motion to dismiss (doc. 8), which the court granted in part and denied in part (doc.

1

25).  The court dismissed with prejudice all claims under the substantive component of the Due Process Clause of the Fourteenth Amendment, and dismissed without prejudice the following claims asserted against the City: Count I's claim for failure to investigate and discipline because the alleged failures occurred after the incident made the basis of the suit and could not have been the cause or moving force behind them; and Count II's claim for failure to train, supervise, investigate, and discipline *regarding the use of a patrol vehicle*, because the claim did not sufficiently allege that the City had notice of a need to train or supervise in this area and that any failure on the part of the City was the moving force behind an alleged Constitutional violation. The court denied the City's motion to dismiss as to the claim in Count I alleging a failure to train and supervise *regarding use of force involving Tasers*, in violation of the Fourth Amendment.

On January 16, 2017, the Plaintiff filed a motion for leave to amend the complaint (doc. 28), attaching the proposed pleading (doc. 28-1).  The Defendants opposed the motion (doc. 80), and the Plaintiff's filed a reply (doc. 32).  The court granted in part and denied in part the motion to amend, allowing the Plaintiff to file an amended complaint but not the one attached to the motion, as it was a shotgun complaint and suffered from other problems of clarity.  (Doc.33).

The Plaintiff timely filed his Amended Complaint (doc. 35), and all Defendants jointly filed the motion to dismiss (doc. 36) addressed here.

## II.  STANDARD OF REVIEW

The court set out the standard of review in its previous Memorandum Opinion addressing the first motion to dismiss (doc. 24), and incorporates by reference that standard here.

2

## III.  FACTS

*The Alleged "Excessive Force" on May 30, 2015*

The parties had conducted discovery before filing the Amended Complaint, which may explain why the facts alleged here have changed from those stated in the original Complaint. The alleged excessive force occurred at approximately noon on May 30, 2015.  According to the Amended Complaint, the Plaintiff, Major Stephens, was standing, unarmed, in an apartment parking lot, when two officers in a patrol car started driving toward him.  The Amended Complaint does not explain why the officers were interested in approaching Stephens.  When Stephens tried to get away on foot from the approaching car, Sergeant Voss accelerated and drove the car over the curb and onto the sidewalk, striking Mr. Stephens and pinning him between the car and some other surface.  Mr. Stephens extricated himself and continued to move down the street on foot, away from the officers.  The Amended Complaint does not allege any facts indicating that Mr. Stephens was a threat to the officers, but it does indicate that he was attempting "to retreat" from them.

As Mr. Stephens retreated, the other officer who had been in the car, Defendant Justin Willis, commanded him to stop.  Mr. Stephens immediately complied with the command and attempted to surrender.  However, Officer Willis ignored his compliance and his attempt to surrender, immediately deploying his Taser toward Mr. Stephens from about fifteen to twenty feet away.  At the time of this deployment, Mr. Stephens was facing Officer Willis, and the upper prong of the Taser struck Mr. Stephens in the face, with electrical current entering his right eyeball.  The lower Taser prong struck his lower pant leg.  Willis continued to discharge electrical current into Stephens's head and eyeball for about five seconds.  At no point prior to

deploying the Taser did any officer attempt to apply handcuffs to Mr. Stephens.

As a result of the Taser strike, Mr. Stephens's right eye was damaged, and Mr. Stephens has undergone extensive medical treatment, which included the removal of his right eye.

*Prior Taser Events*[1]

In his Amended Complaint, Mr. Stephens recounts the following prior events involving Tasers to establish that the City was on notice that its officers needed Taser training but that the City was deliberately indifferent to that need; and further, to establish that the City had a policy of failing to investigate use of force incidents involving Tasers and of failing to discipline its officers when the use of Tasers was unlawful.

(1) Prior to May 30, 2015, an unidentified City officer "unlawfully" deployed his Taser against a citizen in excess of 20 seconds, causing the citizen to be paralyzed and affecting his mental functioning. Despite the filing of a formal citizen complaint and lawsuit regarding this incident, the City "failed to discipline, provide any remedial training, or even conduct a formal investigation. . . ." (Amend. Compl. Doc. 35, at 5 ¶ 21).

(2) Prior to May 30, 2015, an unidentified City officer, when in the midst of a personal domestic dispute, "unlawfully" used his Taser against his significant other. The City failed to discipline the officer who deployed the Taser; failed to provide remedial training to that officer regarding Taser use; and failed to conduct a formal investigation regarding the incident. (Amend. Compl. Doc. 35, at 5-6 ¶ 22).

_____

[1] The court notes that the Defendants argue in their brief that the court should consider that the officers involved in the first three incidents listed are no longer employees of the City. (Doc. 36, at 19). However, this information is not part of the Amended Complaint, and, as Mr. Stephens pointed out in his brief, is not appropriate fodder for argument at this stage.

(3) Prior to May 30, 2015, an unidentified City officer, when in the midst of a personal domestic dispute, "unlawfully" used his Taser against the significant other's dog.[2] The City failed to discipline the officer who deployed the Taser; failed to provide remedial training to that officer regarding Taser use; and failed to conduct a formal investigation regarding the incident. (Amend. Compl. Doc. 35, at 6 ¶ 23).

(4) In December of 2012, Defendant Officer Willis deployed his Taser for twenty-five seconds. The Amended Complaint refers to an "entry" reflecting this lengthy deployment, but does not identify in what document this "entry" was located or state whether other City officers or officials were aware prior to May 30, 2015 of this entry and/or lengthy Taser deployment. The City failed to discipline Officer Willis for this lengthy deployment; failed to provide remedial training to him regarding Taser use; and failed to conduct an investigation regarding the incident. (Amend. Compl. Doc. 35, at 13 ¶ 60). The Amended Complaint further states that Officer Willis has deployed his Taser "on an individual for at least five [ ] seconds on multiple occasions," but it does not provide any other details, such as when these events occurred. (Amend. Compl. Doc. 35, at 7-8 ¶ 32).

(5) At some unidentified date prior to May 30, 2015, Defendant Officer Willis deployed his Taser on a citizen, and the Taser prongs failed to land on the citizen's lower center mass as required but landed instead on the citizen's upper back and pants leg. The City did not investigate this Taser deployment. The Amended Complaint lacks any other details about this

---

[2] The Amended Complaint does not identify the officer or the date and does not specify whether the Taser use against the dog occurred in the same domestic dispute as the Taser use against the significant other. Therefore, this third incident may or may not be a separate incident from the second, and indeed, the Defendants indicate in their brief that the two incidents involved the same officer and the same domestic dispute.

event.   (Amend. Compl. Doc. 35, at 11 ¶ 48).

The Amended Complaint states: "Out of the numerous Taser deployments on Defendant City citizens discovered in this case, only one (1) of the Tasings was executed properly regarding placement of the Taser prongs," but it does not state which one.  (Amend. Compl. Doc. 35, at 11 ¶ 49).  These five deployments listed as "Prior Taser Events" are the only ones specifically listed in the Amended Complaint.  The Amended Complaint does not specifically allege that the City or Defendant Officers (other than the officer deploying the Taser) *were aware prior to May 30, 2015* that these deployments involved improperly placed Taser prongs.

*City Policy/Custom/Practice Regarding Taser Use*

In addition to these specific events, the Amended Complaint states that, although the City officers' Taser use was "common,"  the City has implemented no written policy, and no specific procedures and practices regarding use of force with Tasers to guide and monitor the actions of officers.

Further, the Amended Complaint states that the City has a custom of not investigating use of force reports or citizen claims about officer use of force, including Taser use, either informally or formally, to determine whether the use was appropriate and/or constitutional.  Nevertheless, the Amended Complaint refers to a "use of force report."  The City has no written policy requiring an investigation, whether formal or informal, after Taser deployment to determine whether the use was appropriate and/or constitutional.  Rather, the City's custom and practice is to use "plain, everyday, common sense" in determining whether to investigate.  The Amended Complaint states that the current policy of the City, presumably based on custom and practice, is to take the word of the officer deploying force regarding the facts and context of the use of force.

That officer's "word" is not based on officer interviews, which are not required and are not performed, but is based simply on what the officer reported on the use of force report. When officers deploy force, the City's custom and practice requires no determination regarding the appropriateness or constitutionality of the force; requires no interviews of either the officer using force or witnesses to the use of force; and does not require that an independent investigation be conducted.

Lieutenant Rice, who is currently responsible for the Patrol and Detective divisions, is tasked with reviewing reports, radio logs, detective reports, and supervising all the sergeants and police officers, including Officer Willis during his tenure. He also is responsible for receiving and investigating citizen complaints, and maintaining them and any other Internal Affairs files in his personal office. The officers, including Officer Willis during his tenure at Tarrant, submit use of force reports to Lieutenant Rice, and those reports apparently receive some sort of review, because the Amended Complaint reflects that Officer Willis occasionally had reports sent back to him for revision. However, the only requests for revision communicated to Officer Willis involved correction of grammatical errors or punctuation, even when his reports included inconsistencies. Other than the grammatical corrections, Officer Willis has received no response to his use of force reports, no investigation of multiple Taser deployments, and no discipline as a result of use of force, including Taser deployments.

Before he became chief in 2010, Chief Reno previously held the position of Lieutenant in charge of investigating complaints against the City officers, including complaints of excessive force. During his tenure in that position, he failed to conduct any investigation based on those complaints and received no direction from the prior Chief of Police to do so. Now that

Lieutenant Rice holds that position, Rice is responsible not only for investigating citizen complaints but also for providing copies of such complaints to Chief Reno. Despite that obligation, the Chief has received a copy of only one citizen complaint during his tenure as chief: the lawsuit involving a Taser strike that left the victim paralyzed described above. The Amended Complaint states, on one hand, that during his tenure as chief, Reno has failed to review a single citizen complaint regarding excessive force since 2012. On the other hand, the Amended Complaint states that Chief Reno did receive one complaint—the Taser deployment resulting in paralysis—but the Amended Complaint alleges that the Chief failed to follow up to ensure that the City conducted a formal investigation of this incident and provided remedial training. The Amended Complaint implies but does not specifically state that the City received more complaints than the *one* excessive force complaint forwarded to the Chief, and that Rice failed to advise the Chief of the additional complaints.

The Chief has never asked Lieutenant Rice about how and if he conducts an investigation to determine whether an officer using force did so in compliance with the City's use of force custom/policy. Further, since becoming Chief, he has never reviewed any of the Internal Affairs files regarding use of force complaints that Lieutenant Rice maintains. The Chief has failed to institute any written policy regarding when a use of force requires investigation.

The City has never disciplined any officer for excessive use of force with a Taser, despite "admissions of Defendants Chief and Willis and Sergeant Voss [that] prior violations of Defendant City policy" had occurred. (Doc. 35, at 7 ¶ 29). The Amended Complaint does not provide the specific content of the admissions, and does not specify whether the admissions of prior violations involved use of force with a Taser.

The Amended Complaint gives examples of City officers who have used their Tasers on multiple occasions without investigation or discipline, although it provides no facts surrounding the deployments except the five listed in the "Prior Taser Events" section. It makes confusing statements that are difficult to decipher regarding the circumstances surrounding the Taser incidents, including the number and dates of those incidents and the content of the "admissions" of policy violations that certain officers made about them.

Since the May 30, 2015 incident made the basis of this suit, Officer Willis transferred to the City of Huntsville Policy Department.

Sergeant Voss has deployed his Taser on four to five occasions[3] and, like Officer Willis, has never been interviewed regarding his use of force nor has any City official asked him to provide his Taser to check whether it has been deployed. The City has not disciplined Voss for his Taser deployment.

*Training Regarding Taser Use*

The Amended Complaint states that City failed to provide its officers with "adequate" training in the use of Tasers. For example, Officer Willis received Taser training when he was originally hired that was limited to a video class and written questions without an opportunity to practice and with no updated training throughout his entire employment with the City. Mr. Stephens alleges that the City's Taser training was inadequate because: (1) no training occurred on how to stop the electrical current from entering an individual after Taser deployment, despite Taser training recommendations to do so; (2) no training occurred on how or where to point the

---

[3] The Amended Complaint does not specify whether any or all of these occasions occurred prior to May 30, 2015.

Taser, resulting in a majority of reported Taser uses having the Taser prongs land incorrectly; (3) no training occurred on pointing the Taser light at a suspect prior to deploying the Taser to encourage compliance without deployment, despite Taser training recommendations to do so; (4) the officers received no opportunity to practice using the Tasers prior to deploying them on citizens, despite Taser training recommendations to have at least two practice deployments.

*Excessive Force Generally*

The Amended Complaint also asserts that City officers have "a widespread history of excessive force." (Doc. 35, at 14 ¶ 66). Although the Amended Complaint does not provide specific examples of that "widespread" history, other than the Taser incidents described previously, it lists the following general "systemic deficiencies" on the part of the City:

> a. failing to implement policies, procedures and practices regarding use of force that appropriately guide and monitor the actions of Tarrant Police Officers; and
> b. failing to supervise Defendant City Police Officers and Supervisors adequately to prevent the reoccurrence of the use of excessive force.

(Doc. 35, at 15-16 ¶ 66). The Amended Complaint also asserts that Officer Willis never took an officer Continuing Education course that covered use of force or reporting use of force.

## IV. DISCUSSION

The Defendants assert in their motion to dismiss that all claims in the Amended Complaint are due to be dismissed: Count I—failure to train and supervise use of force, brought pursuant to § 1983 for violations of rights under the Fourth and Fourteenth[4] Amendment, and asserted against the City and against the Chief Reno and Lieutenant Rice in their official

---

[4] In his brief, Mr. Stephens acknowledges that he does not bring any claims in the Amended Complaint based on the Fourteenth Amendment's right to substantive due process, and the court had previously dismissed with prejudice any such claims.

capacities only; Count II—failure to discipline and investigate, brought pursuant to § 1983 and

asserted against the City and against the Chief Reno and Lieutenant Rice in their individual

capacities; Count III—use of excessive force with a Taser, brought pursuant to § 1983 and

asserted against Officer Willis in his individual capacity; Count IV—tort of outrage, brought

under Alabama law and asserted against Officer Willis, Chief Reno, and Lieutenant Rice; and

Count V—assault and battery, brought under Alabama law and asserted against Officer Willis.

### A.  Federal Claims Asserted Against the City and/or City Officials

1.  Count I: Section 1983–Failure to Train and Supervise Use of Force, Asserted against City, and against Chief Reno & Lieutenant Rice

*a. The City's Failure to Train and Supervise*

Recognizing that the "failure to train" and "failure to supervise" are often interrelated

omissions, the Eleventh Circuit explained that the court's proper focus in addressing these

interrelated claims is on the "element common to both claims: the alleged failure to train." *Kerr*

*v. City of West Palm Beach,* 875 F.2d 1546, 1555 (11th Cir. 1989).  A city's failure to train a

police officer rises to the level of a municipal custom or policy only in the "limited

circumstances" when its failure shows a "'deliberate indifference' to the rights of its inhabitants"

and the city policy causes the employees to violate a citizen's constitutional rights.  *City of*

*Canton v. Harris,* 489 U.S. 378, 387, 389-91 (1989); *see also Gold v. City of Miami,* 151 F.3d

1346, 1350 (11th Cir. 1998) ("Since a municipality rarely will have an express written or oral

policy of inadequately training or supervising its employees, . . .  a plaintiff may prove a city

policy by showing that the municipality's failure to train evidenced a 'deliberate indifference' to

the rights of its inhabitants.").  To establish deliberate indifference, a plaintiff must show "'that

the municipality knew of a need to train . . . *in a particular area* and the municipality made a deliberate choice not to take any action.'" *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009) (quoting *Gold*, 151 F.3d at 1350) (emphasis supplied).

The court reiterates that the mere fact that officers may be inadequately trained does not implicate municipal liability; to be deliberately indifferent, the City must have had notice prior to the acts made the basis of this suit of a need to train or supervise, and yet, failed to train and supervise despite that notice. Further, a causal link must exist between the deliberate indifference and the denial of the constitutional right. *See Lewis*, 561 F.3d at 1293.

In the instant case, the Amended Complaint alleges that, although the City provided Taser training to its officers, the training was not adequate. The Amended Complaint states that the inadequacy existed in part because the City did not follow Taser recommended training in the following ways: (1) failed to provide two practice deployments of a Taser prior to certification; (2) failed to train officers on how to stop the electrical current from entering an individual after a Taser has been deployed; and (3) failed to train officers on pointing the Taser light at a suspect prior to deploying the Taser as a less forceful means of achieving compliance. The allegations are that the officer who deployed a Taser against Mr. Stephens, Officer Willis, did not have an opportunity to practice using the Taser before he used it on citizens; did not stop the electrical current when it hit Mr. Stephens in the eye but continued to deploy the current into his head for five seconds; and did not provide Mr. Stephens with a warning by pointing the Taser light at him before deploying the Taser.

A reasonable inference from the Amended Complaint is that the Taser training recommendations were communicated to the City but that the City deliberately ignored at least

some of those recommendations and, as a result, that the training program was deficient. However, allegations that the City ignored training guidelines do not necessarily mean that the City had notice prior to May 30, 2015 that any deviation from training guidelines caused violation(s) of federally protected rights.

A plaintiff may show notice and deliberate indifference in a failure to train case in two ways: he may show "a widespread pattern of similar constitutional violations by untrained employees"; or he may show that the need for training, or different training, was "so obvious that a municipality's failure to train its employees would result in a constitutional violation." *Mingo v. City of Mobile*, 592 F. App'x 793, 799 (11th Cir. 2014) (citing *Connick v. Thompson,* 563 U.S. 51, 62 (2011); *see also Gold,* 151 F.3d at 1350-52 (to same effect).

(1). Widespread Pattern

In the instant case, the allegations of the Amended Complaint list several prior Taser incidents involving City officers and assert that these incidents form a widespread pattern of similar constitutional violations sufficient to show notice to the City of training insufficiency and deliberate indifference when it failed to respond. The first incident, involving a City officer's "unlawful" deployment of a Taser in excess of twenty seconds resulting in a citizen's paralysis, arguably provides notice of one constitutional violation involving Taser use. The Amended Complaint does not identify the officer, so he is presumably not Officer Willis. Another incident listed involved Officer Willis's deployment of a Taser for twenty-five seconds, but provides no further information about the deployment except its length and does not indicate whether any physical injury resulted. Because of the length of these deployments, a reasonable inference exists that the lack of training about how to stop the Taser current once deployed could

likely be the moving force behind any constitutional violations.

Two other incidents listed do not help to establish a pattern showing inadequate training: they involve an unidentified officer using his Taser against his significant other and her dog during his own domestic dispute. The training failures listed in the Amended Complaint do not include prohibiting Taser use off-the-job. For the same reasons, the alleged training failures would not be the moving force behind these two incidents. And, in any event, these incidents are not sufficiently similar to the incident in the instant case to form the requisite pattern establishing notice to the City.

The last incident described in the Amended Complaint involves Officer Willis and a misplaced prong, but the allegation of a misplaced prong does not state sufficient facts showing excessive force or a constitutional deprivation.

Therefore, the Amended Complaint states, at most, two prior incidents involving force with a Taser that arguably resulted from the failure to follow training guidelines and arguably violated constitutional rights to be free from excessive force. The two incidents alleged here do not establish a pattern sufficient to show deliberate indifference. *See Denham v. Corizon Health, Inc.,* 675 F. App'x 935, 942-43 (11th Cir. Jan. 13, 2017) (*per curiam*) (finding that only two prior incidents of allegedly similar constitutional violations do not establish a pattern sufficient to support a failure to train theory against a county); *Keith v. DeKalb Cnty,* 749 F.3d 1034, 1053 (11th Cir. 2014) (finding that one prior "incident did not provide the requisite notice to [the supervisor] that the training provided to detention officers was constitutionally deficient."). Therefore, the court FINDS that the Amended Complaint does not allege a pattern of prior constitutional violations sufficient to support a failure to train theory.

(2). "So Obvious"/Single Incident Exception

A second means of establishing notice of a need to train in a particular area is if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390 & n.10. Where the "so obvious" theory applies, no showing of a pattern of prior constitutional offenses is required, so this theory is also known as the "single incident" theory.

The Supreme Court of the United States has not yet decided a case in which it specifically found that such an obvious need existed to support a failure to train without a prior pattern of constitutional violations. Rather, the Supreme Court has "given only a hypothetical example" in a footnote of such an obvious training need: training in "the use of deadly force where firearms are provided to police officers." *Gold,* 151 F.3d at 1352 (citing *Canton*, 489 U.S. at 390 n. 10). As the Supreme Court explained in a subsequent case: "[t]he Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64 (explaining the *Canton* case). Neither has the Eleventh Circuit "ever found an appropriate use for *Canton's* narrow, rare, hypothetical exception to the pattern-of-constitutional-violations requirement." *Robinson v. Brassel,* 2017 WL 2437265, at *12 (June 5, 2017) (granting summary judgment in favor of the defendant city on the failure to train claim in a Taser case).

In its opinion on the first motion to dismiss in the instant case, this court noted that one reading of the original Complaint could be that when the City issued Tasers to its officers, it

provided *no* Taser training at all. Mr. Stephens asserted that the need for such training was "so obvious" to provide notice supporting the failure to train theory; however, in the first round of briefing, the City failed to acknowledged this single incident exception and did not address it. Accordingly, the court found that the City had not met its burden of establishing that the failure to train claim was due to be dismissed.

Mr. Stephens also argued in the first round of briefing (doc. 12, at 8), and reiterates word-for-word the argument in his current briefing (doc. 38, at 12), as follows: "If a Defendant Officer believed it was reasonable force to deploy a Taser device into an unarmed individual's eyeball without even attempting to place him in handcuffs . . ., a reasonable person can draw the inference such officer was improperly trained or supervised in his duties as an employee of Defendant City, thus amounting to a § 1983 violation." In its Memorandum Opinion addressing the first motion to dismiss, this court rejected the argument that the court can infer inadequate training solely from the use of unreasonable force in the incident made the basis of the suit.

More importantly, the Supreme Court of the United States has rejected this argument, instructing that "adequately trained officers occasionally make mistakes" and "the fact that they do says little about the training program . . . ." *City of Canton,* 489 U.S. at 391. Therefore, mere allegations of constitutional deprivation by officers, standing alone, do not support a claim against the City or the supervisors for failure to train or for deliberate indifference. Such an argument is, in effect, calling for the imposition of *respondeat superior* liability, which is a theory of liability that the Supreme Court has repeatedly refused to impose under section 1983 for municipal liability. In its Memorandum Opinion addressing the prior motion to dismiss, this court explained the reason for its rejection of this argument; reiterating it here does not change

the results.

In the Amended Complaint, Mr. Stephens acknowledges that the City provided some Taser training, but asserts that the training was inadequate and did not meet the training recommendations, as previously discussed. In their motion to dismiss and supporting briefing, the Defendants address the "so obvious"/single incident theory for the first time and argue that the facts alleged in the Amended Complaint do not fall within the limited hypothetical that the Supreme Court suggested in its *Canton* footnote. Defendants argue that issuing Tasers is not the same as issuing firearms, which involve deadly force, and they cite several non-controlling cases characterizing Tasers as non-deadly force and refusing to apply the *Canton* "so obvious" theory to allegedly inadequate Taser or beanbag gun training. *See, e.g., Gilliam ex rel. Waldroup v. City of Prattville,* 667 F. Supp. 2d 1276, 1293 (M.D. Ala. 2009) (finding that the failure to re-train officers on the use of their Tasers every year did not fit within the *Canton* hypothetical because "[t]he use of a firearm is presumptively the use of deadly force, *while the use of a taser is not presumptively the use of deadly force.*") (emphasis added), *rev'd in part on the grounds that the excessive force claim did not survive the arrestee's death by Estate of Gilliam v. City of Prattville,* 639 F. 3d 1041 (11th Cir. 2011). The one controlling case Defendants cite, *Smith v. LePage,* 834 F.3d 1285, 1294-95 (11th Cir. 2016), did not address a failure to train claim; however, it is an excessive force case characterizing a Taser as "nonlethal" force.

In the instant case, the facts do not precisely fall within the one "so obvious" hypothetical that the Supreme Court has provided: providing firearms, which are deadly force weapons, without providing training in their use. Here, the training issue involved Tasers, which are designed to incapacitate and not kill. In addition, the court is aware of the reluctance of Courts

of Appeal in failure to train cases to extend the "so obvious" parameters beyond *Canton's* deadly force example. *See, e.g., Estate of Davis ex. rel. McCully v. City of North Richland Hills,* 406 F.3d 375, 385-86 (5th Cir. 2005) (acknowledging that it has been "reluctant to expand" to narrow, "single incident exception"); *see also Flores v. County of Los Angeles,* 758 F.3d 1154, 1159-60 (9th Cir. 2014) (refusing to expand the "so obvious" parameters to allegations of failing to train police officers not to commit sexual assault); *Heyerman v. Cnty. of Calhoun,* 680 F.3d 642, 648-49 (6th Cir. 2012) (refusing to expand the "so obvious" exception to the need to train officers in timely presentation of a defendant to the trial court after remand from the court of appeals).

And, the court notes that the instant fact situation does not involve a complete *failure to train* officers in how to use Tasers, as the original Complaint suggested. Instead, it involves the *quality of the training*.

The court acknowledges Mr. Stephens's argument that the City's failure to follow the "Taser recommended training" represented notice to the City that the Taser training was inadequate under the "so obvious" exception. The Amended Complaint states that the City failed to provide certain "recommended training" for the Taser, but did not specify who recommended the training. The court does not know whether the referenced training recommendations emanated from the manufacturer of the Taser, or from some other source, whether well-established or not. To the extent, if any, that the Amended Complaint is alleging that the inadequacy of the Taser training was patently obvious because the City failed to follow the manufacturer's recommendations for Taser training, this allegation is troubling. However, absent specific guidance to do so from the Supreme Court of the United States and/or the

18

Eleventh Circuit, this court refuses to extend *Canton's "*narrow" and "rare" so obvious/single-incident exception to this circumstance, when the City did provide some Taser training. In sum, the court FINDS that the allegations in this case do not fit within the confines of the single-incident hypothetical in *Canton*.

Accordingly, the court FINDS that the failure to train claim asserted in Count I against the City fails to state a claim; the court WILL GRANT the motion to dismiss as to that claim.

### b. *Official Capacity Claims Asserted Against Chief Reno and Lieutenant Rice*

Official capacity claims are redundant when the complaint also names the city as a defendant; "[w]hen an officer is sued under Section 1983 in his or her official capacity, the suit is simply another way of pleading an action against an entity of which an officer is an agent . . . . Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents." *Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir. 1991) (internal citations and quotations omitted). Thus, when Mr. Stephens sues the City, and Chief Reno and Lieutenant Rice in their official capacities, he is naming the Defendant City in three different ways. Here, naming the individual Defendants in their official capacities as separate, additional parties adds nothing to the claims except an additional layer of redundancy.

The court is aware that Mr. Stephens requests equitable relief; however, he cites no cases that treat the rule in *Busby* differently in cases requesting equitable relief *where the employing entity is also sued. Cf. Welch v. Laney,* 57 F.3d 1004, 1008-09 (11th Cir. 1995) (finding that the Eleventh Amendment immunity did not bar a plaintiff's claims against a sheriff and sheriff's deputy in their official capacities for prospective injunctive relief where those individuals were

the only defendants; the county for which they worked was not sued). Of course, in the instant case, Mr. Stephens asserts claims against not only the individual Defendants but also against the City.

Accordingly, the court WILL GRANT the motion to dismiss as to the claims asserted against Chief Reno and Lieutenant Rice in their official capacities[5] because those claims are redundant and potentially confusing.

### c. Individual Capacity Claims Asserted against Chief Reno & Lieutenant Rice

Although the caption of Count I specifies that it asserts claims against Chief Reno and Lieutenant Rice in their *official* capacities but does not include *individual* capacity claims, the last two paragraphs of the Count refer to *individual* capacity claims.  *See* Doc. 35, at 8-9 & 15 ¶¶ 68 & 69.  This inconsistency is both confusing and troubling. In his brief, Mr. Stephens argues that Defendants Reno and Rice are not entitled to qualified immunity as to the failure to train and supervise claims and confirms that, despite the caption, he intended for Count I to assert claims against the Chief and Lieutenant in *both* official and individual capacities.  Therefore, the court next will address individual capacity claims for this Count.

In their individual capacities, government officials, including officers, are entitled to immunity from suit for actions performed within the scope of their discretionary authority "unless the law preexisting [their] supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in [their] place would be on notice

---

[5]  Count I is the only Count that specifically states official capacity claims. (Doc. 35, at 9).  A footnote states that official capacity claims against Defendant Rice and Defendant Chief are interchangeable with those against the City. (Doc. 35, at 3 n. 1 & 2).

that what the defendant official was doing would be clearly unlawful given the circumstances."
*Pace v. Capobianco,* 283 F.3d 1275, 1282 (11th Cir. 2002).

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "To defeat the presumption of qualified immunity, a plaintiff must demonstrate both that the facts, when viewed in a light most favorable to the plaintiff, establish a constitutional violation *and* that the illegality of the officer's actions was 'clearly established' at the time of the incident." *Glenn v. City of Columbus,* 375 F. App'x 928, 931 (11th Cir. 2010) (emphasis in original) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

The court FINDS that the alleged conduct of Chief Reno and Lieutenant Rice falls within the scope of their discretionary authority, because training and supervision of their officers is conduct "'undertaken pursuant to the performance of [their] duties'" and "'within the scope of [their] authority.'" *See Hardy v. Town of Hayneville,* 50 F. Supp. 2d 1176, 1189 (M.D. Ala. 1999) (quoting *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)).

Next, the court must analyze the qualified immunity defense under a two part framework: (1) whether the allegations establish a constitutional violation, and (2) whether the constitutional right is "clearly established." *Saucier v. Katz,* 533 U.S. 194, 200-02 (2001). The court has already determined that the City's alleged failure to train did not state a claim for deliberate indifference because the Amended Complaint does not sufficiently allege facts establishing notice. The same analysis would apply to the deliberate indifference claims against Chief Reno and Lieutenant Rice, and the court FINDS that Count I of the Amended Complaint does not sufficiently allege facts that would establish their deliberate indifference.

Even assuming *arguendo* that the facts in Count I do so, Chief Reno and Lieutenant Rice are still entitled to qualified immunity because the facts alleged do not meet the "clearly established" prong of the qualified immunity analysis. As discussed previously in section IV.A.1. a. (2), no clearly established law existed as of May 30, 2015 that would have put Chief Reno and Lieutenant Rice on notice that their failure to provide specific additional Taser training violated the constitution or would likely result in constitutional violations.

Therefore, the court FINDS that Chief Reno and Lieutenant Rice are entitled to qualified immunity as to the failure to train claims asserted against them in Count I; the court WILL GRANT the motion to dismiss as to those claims.

2. Count II: Section 1983–Failure to Discipline/Investigate Use of Force against City, and against Chief Reno & Lieutenant Rice in their Individual Capacities

*a. City Liability*

In *Monell v. Department of Social Services,* the Supreme Court of the United States held that municipal liability must be predicated upon more than a *respondeat superior* theory; it may be predicated upon a showing that the unconstitutional action of a government employee implements or executes a city policy or city custom "even though such custom has not received formal approval through the body's official decision-making channels." 436 U.S. 658, 690-91 (1978). To support city liability, the policy or custom must be the moving force behind the constitutional violation. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 820 (1985).

In support of this claim in Count II, Mr. Stephens alleges that the current custom and practice of the City is to not investigate Taser use or any other use of potentially excessive force, either informally or formally, to determine whether the use was appropriate and/or constitutional.

Instead, the City apparently requires officers who deploy Tasers against citizens to fill out a "use of force" report and submit it to Lieutenant Rice, who accepts the officer's explanation for the use of force without investigating. According to the Amended Complaint, neither Lieutenant Rice nor Chief Reno, who held the Lieutenant position before Rice, has ever formally *investigated* an incident involving a Tarrant officer's use of force with a Taser; nor have they ever *disciplined* a Tarrant officer for such use of force. After he became Chief, Reno has never reviewed any use of force reports involving Tasers with the exception of one incident that was the subject of a lawsuit, and has never asked Lieutenant Rice how or if he were investigating incidents in use of force reports. Mr. Stephens asserts that these failures have created an "atmosphere of tolerance and ratification of officers' use of force without an expectation of investigation or accountability, resulting in the use of excessive force being allowed and encouraged by Defendant City, Defendant Chief, and Defendant Rice." (Doc. 35, at 22).

The Eleventh Circuit has explained that "a persistent failure to take disciplinary action against officers can give rise to the inference that a municipality ratified conduct, thereby establishing a 'custom' within the meaning of *Monell.*" *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985); *see Feliciano v. City of Miami Beach,* 847 F. Supp. 2d 1359, 1367 (S.D. Fla. 2012) (finding no deliberate indifference existed because the plaintiff did not show that the government entity had failed to investigate previous incidents).

In the instant case, the first Complaint referred only to the failure to investigate the single incident made the basis of this suit, and the court dismissed the failure to investigate and discipline claim because the single failure to investigate was insufficient for liability. *See* Doc. 24, at 19; *see also Salvato v. Miley*, 790 F.3d 1286, 1297-98 (11th Cir. 2015) (holding that a

single failure to investigate did not support liability under section 1983). However, the allegations of the *Amended* Complaint state that the failure to investigate and discipline use of force incidents, including those with Tasers previously discussed, existed before the incidents made the basis of this suit and covered all use of force incidents during the tenures of Lieutenant Rice and of Reno in his positions of Chief and Lieutenant.

The court notes that the allegations are not that the investigations of previous use of force incidents under Defendants Rice and Reno were inadequate, but rather, that *no* investigations—and consequently, no discipline—occurred at all. The City cannot successfully argue that it had no notice of previous use of force violations when, according to the allegations, it failed to conduct any investigations at all of use of force incidents but had the means to do so; if this argument prevailed, then every police department could successfully avoid deliberate indifference liability simply by failing to investigate any use of force and citizen complaints, then denying notice that it had a problem.

If established, these allegations provide the requisite fault on behalf of the City and the causal link between the challenged conduct and the City's policy; Chief Reno and Lieutenant Rice would have been acting, or failing to act, consistent with the custom of allowing, encouraging, or ratifying excessive force, a custom of which Officer Willis would have been aware when he allegedly used excessive force against Mr. Stephens. Therefore, the court FINDS that the motion to dismiss is due to be DENIED as to the failure to investigate and discipline claim against the City in Count II.

### b. Liability of Chief Reno and Lieutenant Rice

Mr. Stephens also asserts claims in Count II against Chief Reno and Lieutenant Rice in

24

their individual capacities, alleging that their failures to investigate any use of force incidents during their tenures meant that they created an atmosphere of tolerance for use of excessive force and were deliberately indifferent to the rights of those victims of excessive force.  At the time of the May 30, 2015 incident and for some years prior to it, Lieutenant Rice, and not Chief Reno, was the officer responsible for investigation and discipline; however, Chief Reno held the lieutenancy prior to becoming chief.  According to the Amended Complaint, both men followed the same *modus operandi* of failing to investigate use of force and failing to discipline officers even though the Chief acknowledged that prior use of force violations of City policy occurred, including use of force with a Taser.  The Amended Complaint characterizes the failure to investigate as a complete one: no investigations and no discipline regarding use of force.

In the briefing on this motion, Chief Reno and Lieutenant Rice raise qualified immunity as to all claims against them.  However, they do not specifically address the failure to discipline/investigate claim but merely "adopt and assert the same reasoning and arguments made hereinabove for Stephens' claim for [Count I]." (Doc. 36, at 26 & Doc. 42).  This adoption is perplexing because the allegations of a complete failure to investigate and discipline differ from the failure to adequately train with a Taser when some Taser training was provided. In their briefs, the Defendants failed to develop this and other issues, including whether the alleged violation based on a failure to investigate was well established at the time of the incident made the basis of this suit

In any event, regardless of whether the court ultimately finds that the allegations in Count II are inadequate, the Defendants' *briefing* on this issue is inadequate.  The inadequacy provides the court with no grounds—much less sufficient ones—on which to find they are entitled to

qualified immunity. Based on the facts and arguments currently before the court, the court cannot say that Chief Reno and Lieutenant Rice have established their entitlement to qualified immunity from the allegations that they completely failed to investigate any use of force. The court FINDS that the motion to dismiss is due to be DENIED as to this claim in Count II.

> 3. Count III - Excessive Force with Taser against Officer Willis individually

In this Count, Mr. Stephens asserts that Officer Willis used excessive force when he discharged electrical current from his Taser through Mr. Stephens's head and right eyeball for five seconds, resulting in the loss and removal of that eye, and neurological and other damages. As stated in the Facts section, when Officer Willis deployed the Taser, Mr. Stephens was unarmed, complying with Officer Willis's commands to stop, attempting to surrender, and was fifteen to twenty feet away.

All parties agree that this claim is properly analyzed under the Fourth Amendment as opposed to substantive due process of the Fourteenth Amendment. *See* Ds.' Br. Doc. 36, at 29; Resp. Br. Doc. 38, at 16; *see also Graham v. Connor*, 490 U.S. 386, 395; *Carr v. Tatangelo*, 338 F.3d 1259, 1267 n.15 (11th Cir. 2003). "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from excessive force during the course of a criminal apprehension." *Oliver v. Fiorino,* 586 F.3d 898, 905 (11th Cir. 2009). Because Mr. Stephens asserts this claim against Officer Willis in his individual capacity, and the officer raises qualified immunity, the court must determine if the immunity attaches to him.

The court first FINDS that the actions identified in the Amended Complaint fall within the scope of his discretionary authority; indeed, Mr. Stephens so stipulates. (Resp. Br. Doc. 38, at 17). Therefore, qualified immunity attaches *unless* Mr. Stephens meets his burden of pleading

sufficient facts to demonstrate, in the two-part immunity framework, both "that the facts, when viewed in a light most favorable to the plaintiff, establish a constitutional violation *and* that the illegality of the officer's actions was 'clearly established' at the time of the incident." *Glenn,* 375 F. App'x at 931 (emphasis in original). The court can address these two requirements in any order. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

Mr. Stephens argues that a constitutional violation exists because Officer Willis deployed the Taser into his eye when he was complying with the officer's commands to stop and attempting to surrender, and when he was unarmed and too far from the officers to be a physical threat. Defendants, on the other hand, deny that a constitutional violation exists. They assert that Officer Willis had the right to use some degree of reasonable force to effect Mr. Stephens's arrest and that the Amended Complaint includes no allegation that Officer Willis intended to hit Mr. Stephens's eye.

"An officer's use of force is excessive under the Fourth Amendment if the use of force was 'objectively [un]reasonable in light of the facts and circumstances confronting' the officer." *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011) (quoting *Graham*, 490 U.S. at 397). The court judges reasonableness objectively "from the perspective of the reasonable officer on the scene." *Graham,* 490 U.S. at 396. The reasonableness standard "allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

In making a reasonableness determination for Fourth Amendment purposes, "'a court must carefully balance the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the countervailing government interests.'" *Mann v. Taser Int'l, Inc.,* 588 F.3d 1291, 1305 (11th Cir. 2009) (quoting *Graham*, 490 U.S. at 396)). The officer may use force that is "necessary in the situation at hand." *Lee v. Ferraro,* 284 F.3d 1188, 1197 (11th Cir. 2002) (omitting internal quotations). This court determines whether the force was necessary by balancing relevant factors, including: "the severity of the crime at issue[;] whether the suspect poses an immediate threat to the safety of the officers or others[; ] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight [;] the need for the application of force [;] the relationship between the need and amount of force used [;] and . . . the extent of the injury inflicted." *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015) (internal quotations omitted) (quoting the first three factors from *Graham*, 490 U.S. at 396, and last factors from *Lee v. Ferraro*, 284 F.3d at 1198). At times, the Eleventh Circuit has evaluated the excessive force only in light of the first three *"Graham"* factors. *See, e.g., Stephens v. DeGiovanni*, 852 F.3d 1298, 1321-22 (11th Cir. 2017).

Applying that law to the instant case, the court FINDS that the allegations reflect that the force Officer Willis used was excessive under the circumstances alleged. According to the Amended Complaint, Mr. Stephens was unarmed and simply standing in a parking lot when the officers unaccountably pursued him in the police vehicle and pinned him with the car. That scenario does not reflect that he had committed any crime, much less a serious one. Further, the factual allegations indicate that Mr. Stephens was not an immediate threat to anyone, that the need for force was slight, and that he was not actively resisting arrest: he was unarmed, compliant, and attempting to surrender at the time of the Tasing. Finally, the extent of the injury was significant: he eventually lost his right eye.

While Mr. Stephens initially did attempt to walk away from the situation after he extricated himself from being pinned by the car, Officer Willis did not use the Taser against him at that point. Instead, according to the Amended Complaint, the Tasing occurred after Mr. Stephens complied with Officer Willis's commands to stop: he had halted and was attempting to surrender when Officer Willis deployed the Taser into his head and eye.

In *Fils,* the Eleventh Circuit found that the use of a Taser on a suspect was excessive force when the crime for which the suspect was arrested was a non-serious crime such as disorderly conduct; when the suspect was merely having a private conversation and did not present a threat to anyone's safety; and when he put his hands in the air upon seeing the Taser, took one step backward, and did not resist arrest or ignore any verbal instruction from the officer. 647 F.3d at 1288-89. The court finds the facts in *Fils* to be analogous to the ones alleged here and to clearly establish that the Taser use was unreasonable, disproportionate and excessive.

Although, according to the allegations, Mr. Stephens did walk away from the police vehicle when he extricated himself, he immediately obeyed commands to stop, so he was not fleeing at the time of the Taser use, and instead, was in the process of surrendering. Like the suspect in *Fils*, he was unarmed and no threat to anyone, and had committed no serious crime. Under these facts, the Tasing of Mr. Stephens, like that of the suspect in *Fils*, represented excessive force in violation of the Fourth Amendment.

In their reply brief, Defendants challenge the sequence of events. They characterize the factual allegations of the Amended Compaint as implying that Mr. Stephens's act of walking away or fleeing may have ended so close to the Tasing that Officer Willis deployed the Taser before realizing that Mr. Stephens had stopped fleeing. The court recognizes that the evidence

ultimately may reflect facts different from the Amended Complaint's allegations, but, at this motion to dismiss stage, the court must accept those allegations. When viewed in the light most favorable to the party asserting the injury, those allegations state that at the time of the Tasering, Mr. Stephens was no longer walking away; he had complied with the command to stop, and was facing Officer Willis and attempting to surrender. To the extent that walking away could be considered resisting arrest, Mr. Stephens had stopped that conduct.

Numerous Eleventh Circuit cases clearly establish that, even if the suspect had previously resisted arrest, the court must look at his conduct at the time of the use of excessive force; qualified immunity does not attach when a genuine issue of material fact exists about whether the suspect was no longer resisting at the time of the use of excessive force. *See, e.g., Hadley v. Gutierriz,* 526 F.3d 1324. 1330-31 (11th Cir. 2008) ("gratuitous use of force when a criminal suspect is not resisting constitutes excessive force"); *Smith v. Mattox,* 127 F.3d 1416, 1418-20 (1997) (affirming denial of qualified immunity where unlawful force breaking the suspect's arm was "readily apparent even without clarifying caselaw"; although the suspect threatened officers in a drug sting with a baseball bat and then fled, he was later apprehended, and had "docilely submitted to arrest" and had lain down on the ground at the time of the excessive force).

Even given the facts alleged in the Amended Complaint, the Defendants argue that the single use of the Taser was reasonably proportionate. As support for their position, they cite the case of *Draper v. Reynolds,* 369 F.3d 1270, 1278 (11th Cir. 2004) in which the Eleventh Circuit found that the officer's single "use of the [T]aser gun to effectuate the arrest of Draper was reasonably proportionate to the difficult, tense and uncertain situation that [the officer] faced in this traffic stop, and did not constitute excessive force." In *Draper*, the plaintiff was not

complying with the officer's commands: he was belligerent, he used foul language and spoke loudly or yelled, paced continually, gestured animatedly, and, despite the officer's numerous requests, failed to obtain papers such as proof of insurance, the log book, and bill of lading that the officer had repeatedly requested. Under those circumstances, the Eleventh Circuit reasoned that "the single use of the [T]aser gun may well have prevented a physical struggle and serious harm to either [the suspect] or [the officer]." *Id.*

The facts in *Draper* are not analogous to those alleged in the Amended Complaint here. The alleged facts do not reflect that the officers or Mr. Stephens were in danger or that the Taser deployment prevented a physical struggle. Defendants also cite *Mann v. Taser Int'l, Inc.,* 588 F. 3d 1291, 1306 (11th Cir. 2009), which involved a suspect who refused to comply with the deputies' requests and actively resisted their efforts to arrest her—facts distinguishable from those alleged here.

In short, the cases that Defendants cite do not involve analogous facts and do not support a finding that the force used against Mr. Stephens was reasonable under the Fourth Amendment. *See also Hoyt v. Cooks,* 672 F.3d 972, 980 (11th Cir. 2012) (finding no constitutional violation where safety threats existed or non-compliance with officers' demands). The court FINDS that the allegations in Count III, if proven, reflect that Officer Willis used excessive force in violation of Mr. Stephens's rights under the Fourth Amendment.

Given Officer Willis's assertion of qualified immunity, the court must next determine the second prong of that immunity framework:  whether the violation was clearly established at the time of the May 30, 2015 incident.  "For the law to be 'clearly established,' case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it

obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Priester v. City of Riviera Beach, Fla.,* 208 F.3d 919, 926 (11th Cir. 2000). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Post v. City of Fort Lauderdale,* 7 F.3d 1442, 1557 (11th Cir. 1993).

In what the Eleventh Circuit characterizes as a "narrow exception [ ]to the rule requiring particularized case law to establish clearly the law in excessive force cases" (*Priester,* 208 F.3d at 926), a plaintiff claiming excessive force may also meet the clearly established prong by showing "that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw." *Mattox,* 127 F.3d at 1419. Put another way, "plaintiff must show that the official's conduct was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution without case law on point." *Id.*

The Defendants, who do not bear the burden on this issue, assert that clearly established law supports the attachment of qualified immunity, not a finding of excessive force. They state that "[t]he United States Supreme Court has clearly established the right of police officers to use some degree of physical coercion or threats to effect arrests." (Ds' Br. Doc. 36, at 34). While that general proposition is true, it does not clearly establish that the force here was appropriate.

Instead, the *Fils* case, which this court finds to be closely analogous, is a 2011 case, so it existed well before the May 30, 2015 events at issue here. That case clearly establishes that use of a Taser on a suspect who has not committed a serious crime, who is unarmed, who poses no safety threat, and who is compliant represents use of excessive force and violates the Fourth

Amendment. 647 F.3d at 1288-89; *see also Oliver v. Fiorino,* 586 F.3d at 908 (addressing disproportionate use of force in the context of Taser deployment, applying the *Graham* factors, and not characterizing the plaintiff's act of walking away from officers as an effort to flee within the meaning of the third *Graham* factor).

This court FINDS that the violation of the Fourth Amendment was clearly established as of May 30, 2015, and further FINDS that, based on the allegations of the Amended Complaint, Officer Willis is not entitled to qualified immunity as to the claim of excessive force in Count III. Accordingly, the court WILL DENY the motion to dismiss as to the claim in Count III that Officer Willis used excessive force in violation of Mr. Stephens's rights under the Fourth Amendment. Of course, Officer Willis may revisit the issue of immunity by filing a motion for summary judgment if discovery establishes that the facts are different than those alleged and that no genuine issue of material fact exists that he is entitled to immunity.

### B. State Law Claims

#### 1. Count IV - Tort of Outrage against Officer Willis, Chief Reno, and Lieutenant Rice, individually

Mr. Stephens alleges that Officer Willis committed the tort of outrage under Alabama law when he intentionally or recklessly deployed the Taser into his eye, causing the loss of his eyeball and physical and emotional distress. He further alleges that Chief Reno and Lieutenant Rice committed the tort of outrage in allowing, ratifying, and encouraging such blatant violations of constitutional rights and in refusing to take any action to remedy the situation. According to Mr. Stephens, Lieutenant Rice's failure to investigate constitutional violations and his creation of an environment of tolerance on the use of force in the City's police department were conduct

establishing that tort.

In Alabama, to prevail on a claim for the tort of outrage, a plaintiff must prove that the defendant's conduct: "(1) was intentional and reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Thomas v. BSE Indus. Contractors, Inc.,* 624 So. 2d 1041, 1043 (Ala. 1993). The Supreme Court of Alabama has explained that the tort of outrage is

> an extremely limited cause of action. It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context. *Whitt v. Hulsey,* 519 So. 2d 901 (Ala. 1987); (2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen,* 447 So. 2d 133 (Ala. 1983); and (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.,* 551 So. 2d 322 (Ala. 1989).

*Potts v. Hayes,* 771 So. 2d 462, 465 (Ala. 2000).

In *Little v. Robinson,* the Alabama Supreme Court qualified *Potts* by stating as follow:

> That is not to say, however, that the tort of outrage is viable in only the three circumstances noted in *Potts*. Recently, this Court affirmed a judgment on a tort-of-outrage claim asserted against a family physician who, when asked by a teenage boy's mother to counsel the boy concerning his stress over his parents' divorce, instead began exchanging addictive prescription drugs for homosexual sex for a number of years, resulting in the boy's drug addiction. *See O'Rear v. B.H.,* 69 So. 2d 106 (Ala. 2011). It is clear, however, that the tort of outrage is viable only when the conduct is "'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" *Horne v. TGM Assocs., L.P.,* 56 So. 3d 615, 631 (Ala. 2010) (quoting Am. Rd. Svc. Co. v. *Inmon,* 394 So. 2d 361, 365 (Ala. 1980)).

*Little,* 72 So. 3d 1168, 1172-73 (Ala. 2011).

Keeping in mind the guidance of the Supreme Court of Alabama and the confines of the tort it created, this court FINDS that the conduct alleged against Officer Willis, Chief Reno and Lieutenant Rice does not fall within the extremely limited confines of the Alabama tort of

outrage. The conduct alleged is not "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Because the court finds that the conduct alleged does not constitute the tort of outrage, the court need not determine whether immunity would attach to the Defendants if it did. Thus, the court FINDS that the motion to dismiss is due to be GRANTED as to the tort of outrage claim, which WILL BE DISMISSED WITH PREJUDICE.

      2. Count V: Assault and Battery asserted against Officer Willis individually

Officer Willis does not address the assault and battery claim in his brief except in a caption—"OFFICER WILLIS IS ENTITLED TO QUALIFIED IMMUNITY AS TO THE EXCESSIVE FORCE AND ASSAULT AND BATTERY CLAIMS—and in a general prefatory statement that "Officer Willis is entitled to qualified immunity. Therefore, Count III and V should be dismissed." (Ds.' Br. Doc. 36, at 31). However, qualified immunity applies to federal § 1983 claims asserted against government officials in their individual capacities, not to state law claims brought against government officials. *See D'Aguanno v. Gallagher,* 50 F.3d 877, 879 (11 th Cir. 1995) ("Because qualified immunity is a defense *only to federal claims*, we hold that the district court erred in concluding that defendants were entitled to qualified immunity on the claims for violation of state law.") (emphasis added).

Defendant Willis makes no further mention of assault and battery, of the statutory tort elements, of case law regarding assault and battery, and fails to apply the facts of this case or to discuss any entitlement to immunity under Alabama state law. Accordingly, the court FINDS that Officer Willis has not met his burden to establish that this claim is due to be dismissed; the court WILL DENY the motion as to the assault and battery claim under Alabama law.

# V. CONCLUSION

In sum, for the reasons stated above, the court WILL ORDER as follows:

1.  Count I–Failure to Train/Supervise Claim brought pursuant to § 1983

•       Claim against the City:  the court WILL GRANT the motion to dismiss as to that claim.

•       Claims against Chief Reno and Lieutenant Rice: the court WILL GRANT the motion to dismiss as to both the official capacity and individual capacity claims.

2.  Count II–Failure to Investigate/Discipline Claim brought pursuant to § 1983

•       Claim against the City: the court WILL DENY the motion as to that claim.

•       Claims against Chief Reno and Lieutenant Rice: the court WILL DENY the motion as to those claims.

3.  Count III–Excessive Force Claim against Officer Willis brought pursuant to § 1983: the court WILL DENY the motion to dismiss as to that claim.

4.  Count IV–Tort of Outrage Claim under Alabama State Law against the Officer Willis, Chief Reno and Lieutenant Rice: the court WILL GRANT the motion to dismiss as to that claim.

5.  Count V–Assault and Battery Claim under Alabama State Law against Officer Willis: the court WILL DENY the motion to dismiss as to that claim.

The claims that remain at this point are Count II—§ 1983 claims for failure to investigate/discipline against the City, and individual capacity claims against Chief Reno and Lieutenant Rice; Count III—§ 1983 excessive force claim against Officer Willis in his individual

capacity; and Count V— Assault and Battery claim against Office Willis under Alabama state law.

Dated this 28th day of June, 2017.

_Karon O. Bowdre_
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE