FILED
2018 May-31 PM 03:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **MAJOR STEPHENS,** | ] |
|     **Plaintiff,** | ]<br>]<br>] |
| **v.** | ]    **CIVIL ACTION NO.**<br>]    **2:16-CV-274-KOB** |
| **CITY OF TARRANT, et al.,** | ]<br>] |
|     **Defendants.** | ] |

## MEMORANDUM OPINION

This § 1983 matter is before the court on Plaintiff Major Stephens's "Motion For Summary Judgment Against Defendant Justin Willis" (doc. 56) and the Defendants' "Motion for Summary Judgment (doc. 55). The parties have filed cross motions for summary judgment as to Defendant Justin Willis's liability. The other defendants—the City of Tarrant, Chief of Police Dennis Reno, and Lieutenant Larry Rice (the "supervisory defendants")—also move for summary judgment in their favor on their liability. The court will DENY the cross motions for summary judgment as to Officer Willis's liability. The court will GRANT the supervisory defendants' motion for summary judgment in their favor.

Mr. Stephens also brings state-law assault and battery claims against Officer Willis, but concedes them and consents to their dismissal. Accordingly, the court will DISMISS Mr. Stephens's assault and battery claims against Officer Willis WITH PREJUDICE.

The court additionally has before it Mr. Stephens's "Motion to Strike" (doc. 60) the Defendants' brief in support of their motion for summary judgment. The court will DENY Mr. Stephens's "Motion to Strike."

## **STANDARD OF REVIEW**

Summary judgment is an integral part of the Federal Rules of Civil Procedure. Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Id*. at 322-23.

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986); *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Furthermore, all

evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

## **FACTS**

*A.   Mr. Stephens's Arrest*

On May 30, 2015, Tarrant police officers, including Defendant Justin Willis, responded to a call from Birmingham police requesting assistance in recovering a carjacked vehicle. Although Officer Willis maintains that dispatch told him the suspect in the carjacking was armed, the dispatch audio recording indicates only that dispatch told Officer Willis that the situation involved a possible carjacking. A written account of the dispatch call log states that a firearm was "involved." (Doc. 65-5 at 2).

Officer Willis arrived at an apartment complex and was the first police officer on the scene; Mr. Stephens had arrived earlier. Upon arriving, Officer Willis saw a car and verified that it was the same car that had been reported stolen. Officer Willis saw Mr. Stephens bending over inside the front driver's side of the car. Mr. Stephens then "pop[ped] out of" the car.

Mr. Stephens had "objects" in his hand, but dropped them and started walking away from the car. Officer Willis reported to dispatch his belief that Mr. Stephens intended to run.

Officer Willis exited his car and commanded Mr. Stephens to stop. Mr. Stephens heard a few officers tell him to put his hands up. (Doc. 55-4 at 9). Mr. Stephens did not comply with any of these requests, choosing to run instead. Officer Willis followed in pursuit.

During that foot chase, another officer tried to block Mr. Stephens's path with his patrol car, but the officer failed to do so successfully. Although the car hit Mr. Stephens in the leg, Mr. Stephens went around or over the car. (Doc. 55-2 at 89). The other officer also briefly joined in

3

Officer Willis's pursuit of Mr. Stephens, but got back into his car. (*Id.* at 89-90. 101-102). Officer Willis estimated that he was more than 30 feet behind Mr. Stephens during most of the chase. (*Id.* at 108).

Mr. Stephens continued to run, crossing a street and jumping a fence, then going around a house and coming back around the front side. The parties' versions of the events after Mr. Stephens came back around the front side of the house differ significantly.

1. *Officer Willis's Version*

Officer Willis says that he commanded Mr. Stephens to stop and that Mr. Stephens did so and turned to face him. Officer Willis could not see Mr. Stephens's hands. Officer Willis surmised that he would have seen Mr. Stephens's hands if Mr. Stephens had positioned them wide of or away from his body. (Doc. 55-2 at 113). Officer Willis thus perceived Mr. Stephens's turn to be "aggressive" because he could not see Mr. Stephens's hands. (*Id.* at 109). To Officer Willis, Mr. Stephens did not look like he was giving up—he did not put his hands up in the air, a "common" response in this situation. (*Id.* at 111).

In a split-second and "out of instinct," Officer Willis fired his Taser at Mr. Stephens from approximately 15 to 20 feet away. Officer Willis aimed the Taser at Mr. Stephens's belt line. Upon being hit by the Taser, Mr. Stephens fell to his stomach. Officer Willis closed the distance between them and handcuffed Mr. Stephens. After Officer Willis patted down Mr. Stephens for weapons, he discovered that one of the Taser's prongs hit Mr. Stephens in the eye. Officer Willis immediately called for medical attention.

2. *Mr. Stephens's Version*

Mr. Stephens describes the events differently. After he returned to the front side of the house, Mr. Stephens "lost all wind" and "collapsed." (Doc. 55-4 at 9). Mr. Stephens then told

4

Officer Willis three times that he was "down" and that he gave up. (*Id.* at 9-10). Mr. Stephens fell with his stomach on the ground, but with his head turned in the direction of Officer Willis as he was approaching. Officer Willis walked toward him, crouched down with his Taser. Officer Willis then fired his Taser from a distance of eight feet, hitting Mr. Stephens in the eye.

3. *Aftermath*

The parties agree about the consequences of the parties' actions on May 30, 2015. Mr. Stephens lost use of his eye. Law enforcement officers discovered a gun in the side floorboard of the stolen car. Mr. Stephens plead guilty to "First Degree Robbery" and a court sentenced him to 20 years' imprisonment for that offense.

B. *Tarrant Police Custom & Policy On Excessive Uses of Force*

The City of Tarrant has training and policies related to its officers' use of Tasers. Officers are to use "common sense" in determining whether to use a Taser on a suspect. For example, the City permits officers in danger of being physically overwhelmed by an arrestee to use a Taser in defense. The City's policy also allows its officers to deploy a Taser on a verbally non-compliant suspect.

When using a Taser at range, the City teaches its officers to aim at suspects' belt loops. The City tells officers not to use a Taser on a person's head or groin area. The City's policy directs officers to only deploy their Tasers at a suspect within 21 feet, although the City's Tasers' maximum ranges are 25 to 30 feet. (Doc. 55-2 at 117-18).

The City investigates all use of force reports "in some fashion." (Doc. 55-9 at 23). The City also investigates all claims made of *excessive* use of force. As a small police department, the City of Tarrant did not have a separate internal affairs division; rather, detectives and lieutenants would be assigned to investigate internal affairs and consider disciplinary action if

necessary. However, the Tarrant police department "[v]ery seldom" received excessive use of force claims or complaints; the most recent incident Chief Reno could recall was Mr. Stephens's case. (Doc. 55-10 at 29-30).

Chief Reno recalled one other excessive use of force complaint during his nearly five-year tenure as Chief of Police, an incident that also involved a Taser. (Doc. 55-10 at 30-31). Chief Reno intended to terminate the officer involved in that incident, but the officer transferred to another department before Chief Reno could complete the firing process. (*Id.* at 138). Chief Reno informed the other department about the disciplinary issue. (*Id.* at 139).

Lieutenant Rice, the Tarrant police department's second-in-command, regularly reviewed and investigated uses of force by Tarrant's officers, as well as other complaints brought against the department's officers. (Doc. 55-9 at 21-22; Doc. 55-10 at 25-27). Lieutenant Rice recalled two incidents—both involving the same officer—in which the officer used his Taser on his girlfriend, his girlfriend's dog, and his daughter's boyfriend. (Doc. 55-9 at 112). Lieutenant Rice suspended the officer and began termination proceedings, but the officer resigned before they could be completed. (*Id.* at 104, 112-13).

Any verbal complaint made from a member of the general public about excessive force would be written down and investigated. (Doc. 55-10 at 28-29). Lieutenant Rice would initiate an investigation into a use of force reported by an officer if the circumstances surrounding the use appeared suspicious or if information suggested that the officer had failed to act correctly. (Doc. 55-9 at 35-36). As part of such an investigation, Lieutenant Rice would speak to witnesses and make notes as necessary. (Doc. 55-9 at 37). In his deposition, Lieutenant Rice testified that the extent and necessity of an investigation would depend on the circumstances and the facts involved. Some cases would require a more in-depth investigation into the facts than others.

(Doc. 55-9 at 38-39). If disciplinary action became necessary, Chief Reno would need to approve Lieutenant Rice's decision first. (Doc. 55-10 at 17).

## DISCUSSION

Mr. Stephens brings a § 1983 direct-liability excessive force claim against Officer Willis and § 1983 supervisory-liability claims against Lieutenant Rice, Chief Reno, and the City. The parties filed cross motions for summary judgment as to Officer Willis's liability. Lieutenant Rice, Chief Reno, and the City also move for summary judgment in their favor on the question of supervisory liability.

Officer Willis, Lieutenant Rice, and Chief Reno all claim qualified immunity, arguing both that they committed no constitutional violation and that any constitutional violation they could have committed would not be clearly established. The City of Tarrant similarly argues that Mr. Stephens has failed to establish its liability. The court discusses Officer Willis's motion for summary judgment first; Mr. Stephens's motion for summary judgment second; and Lieutenant Rice, Chief Reno, and the City's motion for summary judgment third.

As discussed more fully below, the court reaches the following decisions. The court finds that genuine issues of material fact exist as to whether Officer Willis used excessive force in deploying his Taser against Mr. Stephens. But, resolving those genuine issues of material fact in favor of Mr. Stephens—as the court must for the purpose of deciding the applicability of qualified immunity at summary judgment—the court finds that a constitutional violation occurred. Furthermore, the constitutional violation shown by Mr. Stephens was clearly established. Officer Willis, therefore, is not entitled to qualified immunity and the court will DENY his motion for summary judgment.

However, when considering Mr. Stephens's motion for summary judgment, the court does not resolve the genuine issues of material fact in his favor. And because genuine issues of material fact exist, the court will also DENY Mr. Stephens's motion for summary judgment.

As to Lieutenant Rice, Chief Reno, and the City, the court finds that no genuine disputes of material fact exist. Mr. Stephens has failed to establish that the supervisory defendants violated his constitutional rights. Lieutenant Rice and Chief Reno are entitled to qualified immunity; the City is not liable. All three, therefore, are entitled to summary judgment in their favor. The court will GRANT their motion for summary judgment.

A. *Motion to Strike*

Mr. Stephens moves to strike the Defendants' brief in support of their motion for summary judgment for failure to comply with Appendix II. Specifically, Mr. Stephens asserts that the Defendants' statement of facts does not include the facts argued in support of summary judgment in favor of the City, Chief Reno, and Lieutenant Rice. In addition, Mr. Stephens contends that Defendants' brief includes disputed facts in its undisputed facts section. However, the court finds that Mr. Stephens overstates Defendants' transgressions. The court will therefore DENY Mr. Stephens's motion to strike. (Doc. 60).

B. *Officer Justin Willis*

Both Officer Willis and Mr. Stephens move for summary judgment regarding Officer Willis's liability under § 1983 for excessive use of force in effecting an arrest. Officer Willis claims qualified immunity, so the court will address his arguments for summary judgment in his favor before turning to Mr. Stephens's own motion for summary judgment.

The applicability of qualified immunity presents a question of law. *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). To be eligible for qualified immunity, a government official

must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful acts occurred. *Id.* at 1194. The burden then shifts to the plaintiff to show that qualified immunity is inappropriate. *Id.* A claim of qualified immunity fails only if the plaintiff has shown the deprivation of a clearly-established constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that courts may conduct *Saucier*'s analysis in any order). In evaluating the applicability of qualified immunity at the summary judgment stage, the court resolves all issues of material fact in favor of the plaintiff. *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013).

The parties agree that Officer Willis was acting within his discretionary authority, and the court agrees that Officer Willis was acting within his discretionary authority when he chased Mr. Stephens and deployed the Taser. Accordingly, the court looks to whether Officer Willis committed a constitutional violation and whether that constitutional violation was clearly established.

   *1. Constitutional Violation*

The Fourth Amendment encompasses the right to be free from uses of excessive force during an arrest. *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). Only "objectively unreasonable" uses of force under the circumstances of the case are excessive. *Id.* The court must judge a use of force "on a case-by-case basis" and only from the perspective of a reasonable officer on the scene. *Id.* (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)). The court should not consider what the most appropriate action would have been in hindsight. *Id.* So "if an objectively reasonable officer in the same situation could have believed that the force used was not excessive," then no constitutional violation occurred and the officer is entitled to qualified immunity. *Id.* at 1346.

The court considers several factors in determining whether a use of force was objectively reasonable. These factors include "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officer or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Particularly, the "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008).

As to the severity of the crime at issue, the parties do not dispute that Officer Willis pursued Mr. Stephens after being dispatched about a car stolen during a suspected carjacking. Nor do the parties dispute Mr. Stephens ultimately pleaded guilty to robbery, or that a court sentenced him to 20 years' imprisonment for his conduct on May 30, 2015. Furthermore, an objectively reasonable officer could have concluded that Mr. Stephens was armed given knowledge that Mr. Stephens was suspected of committing a carjacking—a serious felony often committed with a firearm or some other type of force.

Next, the undisputed facts show that Mr. Stephens was attempting to evade arrest by flight just prior to Officer Willis's deployment of the Taser. But the parties do not dispute that Mr. Stephens had stopped running before Officer Willis used the Taser. They do, however, dispute the extent to which Mr. Stephens had been subdued before Officer Willis's deployment of the Taser.

Because a fully subdued suspect does not present any danger to officers or the public, courts more often find a use of unreasonable force when a suspect is subdued and officers nevertheless continue to use debilitating force. *See, e.g.*, *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926-27 (11th Cir. 2000) (denying qualified immunity in light of clearly excessive force used by officer who allowed police dog to attack arrestee who was already subdued and

lying on the ground); *Smith v. Mattox*, 127 F.3d 1416, 1418-1420 (11th Cir. 1997). But the court must also "allow[] for the fact that police officers are often forced to make split-second judgments." *Graham*, 490 U.S. at 396-97. So "qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." *Ferraro*, 284 F.3d at 1200.

The key question in this case is whether—from the standpoint of an objective officer at the scene—Mr. Stephens was subdued or otherwise posed no immediate threat to Officer Willis's safety. Mr. Stephens maintains that he "stopped, showed his hands, and actively surrendered." (Doc. 64 at 5). Conversely, Officer Willis submits that Mr. Stephens "turned around toward [Officer] Willis in an aggressive manner and in a way which did not cause Officer Willis to believe that [Mr.] Stephens was giving up." (Doc. 55-1 at 5).

On one hand, a jury could agree with Officer Willis's version of events. Mr. Stephens remained an active threat even though he had stopped running. The danger created by Mr. Stephens's decision to evade arrest remained unvitiated. *See Ferraro*, 248 F.3d at 1199-1200. Mr. Stephens did not "actively surrender." Although Mr. Stephens stopped and turned around, Officer Willis could not see Mr. Stephens's hands, had reason to believe Mr. Stephens was armed, and had just engaged in a lengthy foot pursuit of a suspect of a serious and potentially violent crime. Making a "split second" decision, Officer Willis used his Taser to subdue Mr. Stephens and remove the danger. Officer Willis's "split second" decision did not violate Mr. Stephens's constitutional rights.

On the other hand, a jury could accept Mr. Stephens's recounting of events. According to his testimony, Mr. Stephens had already collapsed and already surrendered *before* Officer Willis fired his Taser. As he lay stomach-side on the ground, Mr. Stephens no longer presented a

11

serious danger to Officer Willis or the public. When that happened, the chase switched from "tense, uncertain, and rapidly evolving" to finished. *Cf. Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (officer who deployed Taser once on actively "belligerent" and noncompliant—but nonviolent—detainee entitled to qualified immunity) (quoting *Graham*, 490 U.S. at 396-97).

With the chase finished and Mr. Stephens on the ground, Officer Willis no longer needed to make any "split second" decision to ensure his safety—his actions could be more calculated. And Officer Willis no longer had reason to use his Taser on Mr. Stephens. So, Officer Willis's subsequent close-range deployment of the Taser was wholly "gratuitous" and in violation of Mr. Stephens's constitutional rights. *See Hadley*, 526 F.3d at 1330; *see also Claridy v. Golub*, 632 Fed. Appx. 565 (11th Cir. Nov. 30, 2015) (concluding that police officer violated arrestee's constitutional rights by using Taser when arrestee was "face-down" on a "sidewalk with his hands behind his back").

Because Officer Willis raises qualified immunity, the court takes Mr. Stephens's version as true for the purpose of deciding Officer Willis's motion for summary judgment. *See Sheth*, 145 F.3d at 1236. And because Mr. Stephens's version shows that a constitutional violation occurred, the court must address whether Officer Willis violated a clearly established right before deciding whether qualified immunity applies. The court thus turns to that issue.

   2.   *Clearly Established*

Although few areas of law present a more fact-specific analysis than § 1983 excessive force claims, the law clearly establishes in the Eleventh Circuit that gratuitous uses of force are unreasonable. *See, e.g.*, *Wate v. Kubler*, 839 F.3d 1012, 1021 (11th Cir. 2016); *Hadley*, 526 F.3d at 1330; *Lee*, 284 F.3d at 1200. In particular, this case presents facts analogous to those of

*Claridy v. Golub*, in which the Eleventh Circuit affirmed a district court's denial of qualified immunity. *Claridy*, 631 Fed. Appx. at 570.

In *Claridy*, the plaintiff initially acted toward investigating officers with a hostile and non-compliant attitude. *Claridy*, 631 Fed. Appx. at 566-57. Although the plaintiff was not actively evading arrest, officers had reason to suspect that the plaintiff was moving toward a firearm as the situation developed. *Id*. An officer used his Taser on the plaintiff, knocking the plaintiff to the ground and subduing him. *Id.*

However, after the plaintiff fell face down on the ground and had moved his hands behind his back, the officer used his Taser on the plaintiff a second time. *Id.* at 569. The district court and Eleventh Circuit found that the officer's second use of the Taser was gratuitous—despite the plaintiff's initial noncompliance—because the plaintiff was "not resisting and had submitted to arrest." *Id.*

Under Mr. Stephens's facts, he was, like the plaintiff in *Claridy*, initially noncompliant and potentially violent. And like the suspect in *Claridy*, he became compliant as the situation developed: at the time of the unconstitutional Taser deployment, both Mr. Stephens and the suspect in *Claridy* were face down on the ground, surrendering to officers.

Importantly, Mr. Stephens's version of events establishes that Officer Willis's use of the Taser was not a "split second" decision made in the heat of a chase of a dangerous fugitive. Rather, Mr. Stephens paints the picture of a calculated decision to utilize the Taser *after* he fell to ground and vocalized his surrender. Under these circumstances, Officer Willis's actions crossed the boundary from constitutional to unconstitutional. *See Hadley*, 526 F.3d at 1330; *Claridy*, 631 Fed. Appx. at 570.

13

Resolving the genuine issues of material fact noted above in Mr. Stephens's favor, the court must find Officer Willis not entitled to qualified immunity. The court will accordingly DENY Officer Willis's motion for summary judgment.

*3. Mr. Stephens's Motion For Summary Judgment*

The contradictory sets of facts offered by Mr. Stephens and Officer Willis and discussed above in Section B(1) plainly create genuine issues of material fact about whether Officer Willis used excessive force in arresting Mr. Stephens in violation of the Fourth Amendment. For that reason, the court will DENY Mr. Stephens's motion for summary judgment in his favor as to Officer Willis's liability.

    *C.     Supervisory Liability: City of Tarrant, Chief Reno, and Lt. Rice*

Mr. Stephens also brings § 1983 claims under the Fourth Amendment against Chief Reno and Lieutenant Rice, both of whom are supervisory officials, and the City of Tarrant, which employed Officer Willis. Chief Reno, Lieutenant Rice, and the City move for summary judgment in their favor.

Supervisors and municipalities cannot be liable under § 1983 for the unconstitutional acts of subordinates merely on the basis of *respondeat superior*. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003); *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985). Instead, liability requires a "causal connection" between the municipality or supervisory official's actions or inaction and the alleged constitutional deprivation. *Cottone*, 326 F.3d at 1360. A plaintiff can establish a causal connection when (1) the supervisor or municipality had notice of a widespread history of abuse that he failed to correct; (2) the supervisor or municipality implemented a custom or policy that resulted in deliberate indifference to constitutional rights; or (3) the facts support "an inference that the supervisor directed the

subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1234-35 (11th Cir. 2003)); *see also Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 689 (1978); *Fundiller*, 777 F.2d at 1443.

Initially, Mr. Stephens contends that the City and the supervisory defendants failed to meet their burden under Rule 56 to argue that the undisputed facts support a ruling in their favor. But when the burden of proof at trial is on the nonmoving party, the movant need only point out the absence of evidence supporting the nonmovant's case. *See Catrett*, 477 U.S. at 325 (explaining that a party moving for summary judgment may satisfy his burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case"). The City and the supervisory defendants point out that lack of evidence. Mr. Stephens wisely presents his own evidence and argument in the alternative, although Mr. Stephens's claims against the City, Chief Reno, and Lieutenant Rice nonetheless fail.

Mr. Stephens argues that the City, Chief Reno, and Lieutenant Rice created a custom in the City wherein police officers could use and felt comfortable using excessive force regardless of disciplinary consequences. More specifically, Mr. Stephens contends that the supervisory defendants persistently failed to investigate uses of force and failed to discipline officers that used excessive force. Mr. Stephens states that their inaction amounts to establishing a policy or custom condoning the use of excessive force.

But Mr. Stephens fails to point to sufficient evidence of any policy or practice of failing to investigate or discipline excessive uses of force to raise any genuine dispute of material fact. Mr. Stephens points to several statements by Chief Reno and Lieutenant Rice, but does not provide those statements the appropriate context. For example, Mr. Stephens asserts that Chief

Reno and Lieutenant Rice never talked to independent witnesses when investigating the City's officers' uses of force. But both Chief Reno and Lieutenant Rice testified that they would initiate and undertake such an investigation if one became necessary under the circumstances. Likewise, Mr. Stephens claims that the supervisory defendants "avoid[ed] any investigation into use of Tasers," but the testimony shows that the supervisory defendants did or would investigate departmental Taser use—again, as necessary.

Likewise, Mr. Stephens takes out of context the supervisory defendants' statements that they use common sense when deciding the necessity and depth of an investigation. Mr. Stephens incorrectly suggests that the supervisory defendants' "common sense" was to *avoid* investigations. The supervisory defendants plainly stated that they would investigate and discipline any excessive use of force. Obviously, Mr. Stephens does not *believe* what Chief Reno or Lieutenant Rice said in their depositions. But Mr. Stephens needs to offer evidence of untruth to create a genuine issue of material fact, not concoct it by taking the defendants' testimony out of context.

Mr. Stephens cites no evidence showing that the supervisory defendants would not investigate or punish a Tarrant police officer who used excessive force. Mr. Stephens points to three specific incidents of potential uses of excessive of force. Two incidents involved an officer's flagrant use of his Taser outside the scope of his official duties. Chief Reno or Lieutenant Rice placed the officer involved in both of those incidents on leave and initiated[1] termination proceedings against him.

Mr. Stephens fails to support his claim about the third excessive-use-of-force incident with any evidence. Mr. Stephens asserts that another officer used his Taser for twenty-seconds

---

[1] The officer resigned before the City could complete termination proceedings. (*See* doc. 55-9 at 113-15).

on an individual resulting in that individual's paralysis, but fails to point to any evidence supporting that claim, referring only to evidence about the other two incidents. (*See* Doc. 65 at 25).[2] Mr. Stephens identifies no incidents of *excessive* uses of force that the supervisory defendants failed to investigate, discipline, or did not intend to discipline.

For those reasons, Mr. Stephens fails to establish a causal connection between Officer Willis's use of his Taser and Lieutenant Rice, Chief Reno, and the City's actions. Chief Reno and Lieutenant Rice are entitled to qualified immunity because Mr. Stephens has failed to establish any constitutional violation. The City is not liable for the same reason. The court will, therefore, GRANT the City, Chief Reno, and Lieutenant Rice's motion for summary judgment. The court will ENTER SUMMARY JUDGMENT in their favor.

D.  *Conclusion*

The court will DENY the parties' cross motions for summary judgment on Officer Willis's liability. A genuine issue of material fact exists as to whether a constitutional violation occurred. And, resolving the genuine issues of material fact in Mr. Stephens's favor, a clearly-established constitutional violation occurred, so Officer Willis is not entitled to qualified immunity. The court will GRANT Lieutenant Rice, Chief Reno, and the City's motion for summary judgment. The court will ENTER SUMMARY JUDGMENT in Lieutenant Rice, Chief Reno, and the City's favor.

---

[2] In his deposition, Chief Reno references another lawsuit brought against the City for excessive use of force with a Taser, but does not discuss its details. (Doc. 55-10 at 8). As with the other two incidents, the City began termination proceedings against the officer involved. The officer transferred before the City could complete termination proceedings. (Doc. 55-10 at 138-39). Chief Reno provided that officer's disciplinary file to the officer's new department. (*Id.*).

**DONE** and **ORDERED** this 31st day of May, 2018.

_/s/ Karon O. Bowdre_
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE